Good morning, Your Honor. Andres Quintana for the appellant and defendant Lucky Nahum. This is an interesting case that I had a chance to try. There are essentially two issues of first impression that this court's going to have to address. First, and principally, is whether or not the court is ready to expand the federal question related to the anti-cybersquatting statute to cover facts, the ones presented in the lower court. The legislative history with respect to cybersquatting is very clear. It was enacted over 10 years ago to curb a form of, as the Senate said, a sort of piracy, internet piracy, where people would go out and try to reserve distinctive and famous domain names at the time of the registration and then try to sell those. Counsel, it looks as though that's perhaps the first thing Congress thought of, because I think it's the first word in that anti-cybersquatting law. But they say registers, traffics in, or uses, and that he used it. He did use it, Your Honor, and there's no doubt that he used the website. By the time that it was registered, there was no intent to profit from the website. No. Tell me if I understand these facts right. He and his partner are doing business. One of the tasks that he's doing for the company is setting up a website. Correct. He registers it. He puts it in his name. No reason to think there's anything wrong with that at the time. Correct. But then later, when he and his partner breaks up, he takes it with him in order to use it as leverage to get the commissions that he thinks his partner owes him. That's true, Your Honor. Have I got that all right so far? That's correct, Your Honor. And so the issue here is, with respect to those facts, when you have the... It seems to me that at that point, after he's left, he's holding the website for ransom. Well, when you have a business dispute, Your Honor, I would use the word ransom. What he's trying to do is that he believes at the time that he leaves DSPT, he says, I'm entitled to commissions. I believe I'm owed. There's no back-bait intent to profit, which is what the statute says, to profit. And that's in line with what the purpose of the statute was. I go ahead and I buy a domain name for $10, and then I try to sell it to Corporation X for $1,000. That's an intent to profit, arguably an intent to get some sort of financial gain. In this instance, at the time that he withholds the website... That sounds like a jury issue, whether there was an intent to profit. Well, the issue is whether or not there was evidence of profit, whether or not... Because the issue here is that there was a counterclaim regarding commissions. He believes that under the contract, he was entitled to money. And that is the issue of whether or not the jury believes that, hey, is he owed an additional fund? Is he owed a salary? Is he owed a commission? But the fact that Mr. Nahum was trying to get commissions isn't profit. It isn't more that he was entitled to. He simply wanted what he thought he was entitled to already under the contract. The contemporaneous records show after he left... But it went to a jury trial. I would think that that could be put to the jury. It was one element that he had to have an intent to profit, and they went the other way. Well, there was no evidence for the jury to find that he had an intent to profit. Well, the only evidence was that he was entitled, he thought, the testimony is clear, he thought, both in terms of what he testified to and the contemporaneous records after he left, that he was entitled to a commission. He asked for an accounting. He filed a countersuit. There were experts. And the jury decided, no, we don't believe Mr. Nahum is entitled to any additional commission. But that was with experts. But there's no intent to profit, meaning I'm trying to get more than what I'm entitled to. Mr. Nahum testified, and the contemporaneous records were clear. Mr. Nahum wanted, through correspondence, soon after he left, I want what I'm entitled to. You can have the website, but I want my salary. I want my commissions. I don't remember this issue actually being in the briefs, but I might have missed it. Wasn't the jury instructed on what the elements of the statute were? Well, yes, the jury was instructed, Your Honor, but there was no evidence. That's why we filed the motion notwithstanding the verdict. There was no evidence of an intent to profit, number one. Number two, there was also an issue with respect to bad faith intent. It's not just an intent to profit. In the court, the legislative history is unclear, and there's no case that I can find that has defined what profit means with respect to that statute. Okay? What the legislative history is clear is that the intent was the financial gain that the cyber squatters attempt to obtain from the company is money that, based on the value of the domain name. I reserved the domain name for $10, and I want to get money from the company for that domain name. Mr. Nahum wasn't trying to get additional monies for the actual DSPT because it was unclear as to whether or not that domain name had any value. He simply said contemporaneously, you can have the domain name. What I want is an accounting, and I am entitled to commissions. Okay? The fact of the matter is this is a case of first impression because this is sort of a very atypical case where you have a business association, business relationship. As Your Honor mentioned, there are partners. They've used this domain name for five years. Not an issue. Now there's an issue with respect to you have somebody who's a marketing director, the creative director of the company, as Mr. Dorigo testified, that leads the company, and now there's an issue regarding, okay, well, sort of separation issues. And a lot of these cases, and following this Court's ruling six years ago in the Kremen case, where the Court said domain names under California law is property that falls within the tort of conversion. Okay? So a lot of the cases with respect to domain name issues involving partners and corporate officers that leave and hold on to the domain name is covered by tort law. This would be an expansion of California law, of claims that are brought typically under California law, like tort, like interference, like breach of fiduciary duty, et cetera. And now we're going to create a federal question where, in addition to the fact that you had a former business associate or employee that leaves the company with corporate assets, corporate property, if it involves a domain name, we're going to call that cyber-slaughtering. I don't see why the jury could not infer from the evidence that he was trying to extract money that he wasn't owed by holding the domain name for ransom. There's no evidence of an intent to profit from that. There's no evidence that he was attempting to profit. First of all, I'm not sure profit means getting more than you're entitled to. It may just mean getting money. But even if it does mean getting more than you're entitled to, why couldn't that inference be drawn from him not being owed any money? Because there is no – I mean – I mean, the fact that if the jury did conclude he wasn't owed any money. So I don't see why that doesn't mean that they also concluded that he knew he wasn't owed any money and that he was trying to get money he wasn't owed. But he was not trying to get money from the website. He was not trying to get money per the website. He was trying to get money based on his commissions. All the cases regarding cyber-slaughtering, intent to profit, is I register the domain name and I try to sell the domain name for profit or financial gain, okay? He wasn't – he didn't go and say give me, you know, money for the website. He said you can have the website. I just want my commissions. I'm not intending to profit from the use of the website. It is a big difference, Your Honor, if it goes to intent. When I get back, you give me my commissions. Well, it is a big difference because the point of the intent of the congression of the statute was to curb people who are squatting and are trying to make money from the actual squatting itself, not from some other reason. In this particular instance, he tried to get his money back or at least get an accounting of commissions that he thought he was already entitled to, okay? Moreover, with respect to the bad faith issue, you know, there's – the court implicitly in granting the Rule 50 found no trademark infringement, found that the site itself was non-commercial, was non-commercial use, okay? There was no evidence they lost any customers with respect to Mr. Nahum's refusal to turn over the domain name at that time. So there's a lot of mitigating factors with respect to the nine elements or the nine factors that the statute says with respect to whether or not there's bad faith. Moreover, Your Honor, there's also an issue with respect to whether or not – there's a couple other issues. One is one of, I guess, a second issue of first impression, and that is whether or not DSPT had a protectable mark at the time – because the mark has to be distinctive or famous at the time it's registered. And the issue is at the time of the registration, which took place in 2000, trial Exhibit 15, was the issue – was the mark distinctive? They don't say it's famous. They have to rely on distinctiveness. And the question here is I can find a Ninth Circuit case on this, but when you deal with a single letter or you deal with one or two letters – because the market issue is EQ. When you have a single letter or – you can't just simply say – well, the court said, well, the fact that you have a single letter, that is inherently distinctive. It's arbitrary. You say the letter E, that could be a whole variety of products. But you still have to show whether or not that in and of itself can distinguish your product from other products. I haven't found a Ninth Circuit case on that point. There is a Second Circuit case involving Bacardi at 412F3353, which is the Star Industries case versus Bacardi, which dealt with the letter O. In that particular instance, the court said, well, look, you know, yes, single letters are arbitrary to some degree. And nonetheless, the question that becomes is whether or not there is single letters like that or a combination of letters are sort of, you know, are considered common basic shapes or letters and whether or not they're inherently distinctive. And that was never decided. The trial court simply assumed that because that EQ is arbitrary, that's inherently distinctive. There was testimony and there was evidence presented at the time of the website being registered. Around that time, there were several other apparel companies that had filed for trademark registration. There was one apparel company that was an equestrian company that had a trademark registration. So the question here is that if you have just unstylized letters, EQ put together, is that distinctive under, you know, under what the law says? I couldn't find a Ninth Circuit case on that, but the 2005 case, the Bacardi case. I buy books from Barnes & Noble and it's just BN.com. Well, and that's the title. The question here is whether or not that is a distinctive mark under the law. And there's no evidence that, in fact, introduced by DSPT that that mark was, in fact, distinctive. Finally, there was an issue regarding damages, Your Honor. There is no evidence at all with respect to supporting the $152,000 jury award. They had a damage expert, did they not? That was knocked out for a motion in limine. What did the so the only evidence that went in were financial statements? There was a CD, which is Exhibit 28. It is a CD. We talked about this one before the court. Rather than have a whole bunch of financial, thousands of financial records, the question was let the expert talk about it and let's produce a CD with all these financial records. And if the parties want to talk about the financial records. What was on the CD? Just a bunch of, like, balance sheets and commission reports. There was some tax-related information. There was hundreds of pages, okay? And the goal was to the extent the experts want to cite to it, the attorneys want to use it, let's pull a couple of the sheets out of the CD and file those and submit those separately. And didn't they prove that it cost $31,500 to create a new site? They alleged that it was $31,000 for the replacement cost. But they did more than allege it, didn't they prove it? Well, the jury found that, in fact, the replacement cost was $31,000. That's true. There is no evidence. In fact, that's the only number ever presented that was admissible, because the expert talked about a whole bunch of other dollars that were struck. His testimony and expert report were struck. What the court did is say, well, the jury could have gone beyond the $31,000 because there were a bunch of financial records that were submitted. And I posit that that is respectfully unrealistic, considering you have thousands of pages of financial records on a CD that the jury could never have access in the jury room. You know, there were no financial records that the jury could have cited to other than this CD that was never ---- Equipment so they could look at the CD? We don't know, Your Honor. I have no idea whether or not there was any attempt to ---- Ordinarily, that would come up. Your Honor, the jury is taking a CD into the jury room. Shall we give them a computer so they can read it? That did not come up. We didn't discuss that. As far as we know, they could access what was on the CD. They could access, yes. Theoretically, as far as we know, they could have accessed those documents. But if you look at those documents, there are just hundreds of pages of financial records. Being on a jury doesn't mean you're dumb. No, no. Well, for all I know, there's an accountant on the jury, and he looks at that the same way we look at something from F3rd. That's very possible, Your Honor. I don't know. But that would be quite a complex ---- But the jury can't go beyond ---- Were the documents displayed in court? No. Because the actual report was, and that was stricken, the documents were not displayed in court. And so the issue ---- Let me just make sure I got this straight. The CD was merely introduced but not shown to the jury in the courtroom? The CD was shown, but the documents from the CD, there were several CDs ---- You mean the contents of the CD. All you did was somebody held up a CD. There was a display of those records when the expert testified. When VSPT's expert attempted to testify, his expert reported he cited those documents. But that testimony was stricken. His expert report was stricken. So the jury was left to getting the CD in the jury room. And, you know, yes ---- I see you're over your time with me, but I think you answered my question pretty clearly. Thank you, counsel. Good morning. John Gorman on behalf of VSPT International. I think it's ---- It would be a big help if you would address the damages. Sure. The damages basically came down to ---- It was Mr. DiRigo's testimony about the total sales and the gross profits of the business and the significant drop. DiRigo, the partner who stayed with the business, testified that he was. Yes, technically they were partners. Mr. DiRigo owned 100 percent of the business. Mr. Nahum was an independent consultant, but involved in the business in that sense. And what did DiRigo say in his testimony? He testified that the sales had dropped from 3.8 million in 2005 to 2.8 million in 2006, and that the gross profit had dropped from 1.6 million to 980,000 from 2005 to 2006. And how did he link that to the website problem? He indicated that basically there were no other significant changes besides the website. He explained the importance of the website, the timing of the website being taken down in October, right before the Christmas season, the fact that customers couldn't find them, that there were a number of customers that they weren't hearing from customers during that critical time period, and that he had to go ---- When customers were calling, he would have to send them manually samples the old-fashioned way instead of having them look at the website, which they would do with a customer in the store typically. They'd just pull it up on the screen. They couldn't do that. So when the customer said, I'm interested in this shirt, and they'd have to send a sample out, it would take a week, and the customer was no longer at the store. The sales would disappear. Your damage expert would have made a connection between the taking down of the website and the loss of sales, I gather. The expert would have done that, but Mr. DiRigo did that also. So he's out. So we have Mr. DiRigo. Yeah, we have Mr. DiRigo. And we have a CD that's got a bunch of financial ---- It's very extensive financial information. Like what? What was your best document on there? Well, we had profit and loss statements where one could calculate what the income was and also what the different expenses were by category. Yeah, any connection shown on those documents to the website? They linked in any way to the website? No, they're the standard business financial statements. Okay, so I guess I'm not clear how. We know the sales went down. Yes. And the guy who was going to connect it to the website, his testimony was stricken. Again, but Mr. DiRigo's testimony. Okay, that leaves Mr. DiRigo. But he says it went down, what, over a million dollars. And we're talking sales and gross profits. Right. His gross profits went down $600,000? His gross profits were $620,000 down. Down. And he says he thinks it's due to the website? Yeah, he indicated that he believes there were no significant changes besides the website, that it had to be the website. He had bought a lot of inventory. He was going to sell it at Christmas. And, of course, he couldn't. And then by spring, fashions had changed. The fall and winter merchandise was no longer sellable, and it had to be sold at distressed prices. I'm sort of puzzled how a jury, you proved that it cost them $31,000 and change to get the website back. Yes. He says they lost $600,000. I'm puzzled how you get a verdict of $152,000 on those facts. I believe I explained to the jury during closing argument how they could calculate that using the financial records on the CD. In other words, the CD allowed you to interpret variable costs. We had testimony as to what the commissions were, for example. Is there any rhyme or reason that $31,500 was for the website, that leaves another $120,500? Is there any rhyme or reason that explains that number? I can't tell you what was in the jury minds. You didn't propose it, for example, to tell the jury this is what our loss is, $120,500. I did not make that calculation. They pulled that out from someplace. They were capable of doing that calculation based on the evidence they had heard. What arithmetic would they go through to yield that number from what you know? I can't tell you exactly how that happened. I can't tell you either. It looks like you just pulled a number out of the air. I think that's true in an awful lot of cases. No, sometimes you say you just got through telling me there was a $600,000 loss in profits. So if they gave $600,000, I can kind of understand where they'd come up with that number. Okay. If you told me it cost $31,500 to build a website, so I can see where they'd come up with $31,500. There's an extra $120,000, $500,000 that is inexplicable, and I'm asking you to tell me how they did it. You say you don't know. I don't know, but I can make an educated guess. I can make an educated guess is that you have $600,000 of gross profits. You take into account the 4% or 5% commission that would need to be paid, and then you have the cost of goods versus the sale price. And if you were to take, you know, 15% or 20% as being the profit, the real profit, after you've paid all your expenses, then you would come up with that type of number. And where were all these numbers laid out? They were all in the financial records. Well, I didn't follow what you just said. $600,000 gross profits, usually profits is revenue minus gross profits is sales minus cost of goods sold. Yeah, I guess I misspoke. So you have minus cost of goods sold, and then you've got various overhead and variable costs. The commissions and what other overhead? You've got shipping and receiving, customs, freight. And I'm willing to believe that the jury didn't believe that 100% of the drop was a website. You know, it could have been seasonal changes, and Mr. Quintana asked questions about different types of shirts and trends. To me, what it looked like is kind of like in a personal injury case where one juror says $1 million and another one says $50,000 and another one says $200,000, and they work out some number in between. Was there anything in the arguments that would support that sort of thing? There is no specific figure that was given to them, but how to calculate the figure was explained during the closing argument. They were instructed to take a look at the gross profit and then discount it by whatever the variable cost would be, and I explained how they could do that based on the records that would be with them in the jury room. A logical thing for them would be, well, we think what Nahum did was just try to rip off the company, and the company got ripped off, but Dorigo was exaggerating. And I'm just trying to figure out whether there's something here to justify the amount of exaggeration they attributed to him. A jury is not bound to just take one side's case or take the other side's case, nor are they bound to take one expert's evaluation or the other expert's evaluation. A jury has a lot of power, and I'm trying to figure out what they might have done here. I think they exercised their power, and they probably took the $600,000 figure, discounted it to some extent based on whatever points Mr. Quintana raised, and then took out some variable costs and came up with a figure. But, you know, this is not in the record, but talking to the jurors, some people wanted to go higher and some people wanted to go lower. They came up with a figure, and I think it's a defensible figure. I think that's true in a lot of cases where somebody claims lost income or businesses claim damages. Sometimes I can really see this with juries when I was a lawyer and a trial judge, and you can see that the jury just decided, well, okay, Christmas, okay, three months to get things back up and rolling, but after that, nah, something like that. It's entirely possible that the people had those type of opinions. But it didn't come up in the arguments. It was left to the jury to do the calculations. It was simply an explanation to them of how they could make the calculation based on what they believed was the relevant time period. But, again, given the sanctity of the jury room, I have no way of knowing who expressed what opinion in that jury room. Could you deal with the other argument made by your adversary about the intent to profit? Yes, I'd be happy to. I believe that Your Honor was correct in terms of what the word profit means, that it means basically to get money. If I do work for a client and they send me a check for $5,000, I got the money I was entitled to, but I also made a profit. I received money for my work. Mr. Nahum did, in fact, hold the website hostage, and he tried to extract money, and he called it commissions, but he was trying to get money. That's a type of profit. He also put the placeholder page up and said that if you have any fashion-related questions, refer them to LuckyNahum at Yahoo.com. Now, Mr. Nahum testified that he was an independent contractor who provided fashion-related consulting services for compensation. So he wasn't just putting up a page that talked about the environment or some sort of charitable thing. His placeholder page was directly related to the field in which he made his living, fashion-related questions. It's not required that he make sales off of that. He may or may not have. The question is did he have an intent or the ability to profit from what he did, and I think given the jury's finding on the commissions and the fact that the placeholder directly referred to his occupation, those are for-profit pieces of evidence to support the jury verdict. I don't know if the Court has anything else. I feel that this is just a case of a disgruntled lineage. He chose to go to a jury. He doesn't like the result, but as to each and every one of the factors under the Anti-Cyberspotting Act, there was evidence in the record to support what the jury found. Thank you. Thank you, counsel. I can't recall. I think we used up all the time on that. Thank you, counsel. Thank you. DSPT is submitted. We'll hear SNTL versus Center Insurance.
judges: Hall, Kleinfeld, Silverman